BETSY C. MANIFOLD
manifold@whafh.com
RACHELE R. BYRD
byrd@whafh.com
MARISA C. LIVESAY
livesay@whafh.com
BRITTANY N. DEJONG
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
Symphony Towers
750 B Street, Suite 1820
San Diego, CA 92101
Los Angeles, CA 90071
Telephone: (619) 239-4599

*Counsel for Plaintiff*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TSENGKONG HU, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIDI GLOBAL INC., WILL WEI CHENG, JEAN QING LIU, STEPHEN JINGSHI ZHU, ALAN YUE ZHUO, ZHIYI CHEN, MARTIN CHI PING LAU, KENTARO MATSUI, ADRIA PERICA, DANIEL YONG ZHANG, (additional defendants on next page) | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

GOLDMAN SACHS (ASIA) L.L.C.,
MORGAN STANLEY & CO. LLC,
J.P. MORGAN SECURITIES LLC,
BOFA SECURITIES, INC.,
BARCLAYS CAPITAL INC., CHINA
RENAISSANCE SECURITIES
(HONG KONG) LIMITED,
CHINA INTERNATIONAL
CAPITAL CORPORATION HONG
KONG SECURITIES LIMITED,
CITIGROUP GLOBAL MARKETS
INC., GUOTAI JUNAN SECURITIES
(HONG KONG) LIMITED, HSBC
SECURITIES (USA) INC., UBS
SECURITIES LLC, BOCI ASIA
LIMITED, BOCOM
INTERNATIONAL SECURITIES
LIMITED, CCB INTERNATIONAL
CAPITAL LIMITED, CLSA
LIMITED, CMB INTERNATIONAL
CAPITAL LIMITED, FUTU INC.,
ICBC INTERNATIONAL
SECURITIES LIMITED, MIZUHO
SECURITIES USA LLC, TIGER
BROKERS (NZ) LIMITED,
COLLEEN A. DE VRIES, and
COGENCY GLOBAL, INC.,

Defendants.

Plaintiff Tsengkong Hu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through Plaintiff's undersigned attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief is based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements, public filings, wire and press releases published by and regarding DiDi Global Inc. ("DiDi," or the "Company"), and information publicly available. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of persons or entities who purchased or otherwise acquired publicly traded DiDi securities: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with DiDi's June 30, 2021 initial public offering (the "IPO" or "Offering"); and/or (2) between June 30, 2021 and July 21, 2021, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      On or about June 30, 2021, Defendants held the IPO, issuing approximately 316,800,000 American Depositary Shares ("ADSs") to the investing public at $14.00 per ADS, pursuant to the Registration Statement.

3.      By the commencement of this action, the Company's ADSs traded significantly below the IPO price.  As a result, investors were damaged.

## JURISDICTION AND VENUE

4.     The Securities Act claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

5.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act and 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

7.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Company also maintains a research office in this District focused on natural language processing and speech technologies.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of DiDi securities in this District.

/ / /

1

## **PARTIES**

2      10.    Plaintiff, as set forth in the accompanying Certification, purchased the

3 Company's securities at artificially inflated prices pursuant to the IPO and during

4 the Class Period and was damaged upon the revelation of the corrective disclosure.

5 Plaintiff is a resident of Rocklin, California.

6      11.    Defendant DiDi is purportedly a mobility technology platform,

7 providing ride hailing and other services primarily in the People's Republic of

8 China ("PRC"), Brazil, Mexico and internationally.  DiDi provides ride hailing, taxi

9 hailing, chauffeur, hitch, and other forms of shared mobility services, as well as

10 enterprise business ride solutions; auto solutions comprising leasing, refueling, and

11 maintenance and repair services; electric vehicle leasing services; bike and e-bike

12 sharing, intra-city freight, food delivery, and financial services. The Company was

13 formerly known as Xiaoju Kuaizhi Inc. but changed its name to DiDi Global Inc. in

14 June 2021. The Company is commonly referred to as "the Uber of China."

15      12.    The Company is incorporated in the Cayman Islands and is

16 headquartered at No. 1 Block B, Shangdong Digital Valley, No. 8 Dongbeiwang

17 West Road, Haidian District, Beijing, PRC. DiDi securities trade on the New York

18 Stock Exchange ("NYSE") under the ticker symbol "DIDI."

19      13.    Defendant Will Wei Cheng ("Cheng") was at the time of the IPO and

20 throughout the Class Period the Company's Chief Executive Officer ("CEO") and

21 Chairman of the Board of Directors.  Defendant Wang reviewed, contributed to, and

22 signed the Registration Statement.

23      14.    Defendant Jean Qing Liu ("Liu") was at the time of the IPO and

24 throughout the Class Period the Company's President and a Director.  Defendant

25 Liu reviewed, contributed to, and signed the Registration Statement.

26      15.    Defendant Stephen Jingshi Zhu ("Zhu") was at the time of the IPO and

27 throughout the Class Period the Company's Senior Vice President and CEO of the

28

International Business Group and a Director.  Defendant Zhu reviewed, contributed to, and signed the Registration Statement.

16.     Defendant Alan Yue Zhuo ("Zhuo") was at the time of the IPO and throughout the Class Period the Company's Chief Financial Officer ("CFO").

17.     The Defendants named in ¶¶ 12-15 are sometimes referred to herein as the "Executive Defendants."

18.     Each of the Executive Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (g)     approved or ratified these statements in violation of the federal securities laws.

19.     The Company is liable for the acts of the Executive Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

- 4 -

20.     The scienter of the Executive Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

21.     Defendant Zhiyi Chen was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

22.     Defendant Martin Chi Ping Lau was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

23.     Defendant Kentaro Matsui was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

24.     Defendant Adrian Perica was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

25.     Defendant Daniel Yong Zhang was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

26.     The Defendants named in ¶¶ 21-25 are sometimes referred to herein as the "Director Defendants."

27.     The Executive Defendants and the Director Defendants are sometimes referred to herein as the "Individual Defendants."

28.     Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential DiDi investors, all motivated by their own and the Company's financial interests.

29. Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm that acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sach's address is 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong Special Administrative Region of the PRC.

30. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway, New York, NY 10036.

31. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. J.P. Morgan's address is 383 Madison Avenue, New York, NY 10179.

32. Defendant BofA Securities, Inc. ("BofA") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BofA's address is One Bryant Park, New York, NY 10036.

33. Defendant Barclays Capital Inc. ("Barclays") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Barclays' address is 745 Seventh Avenue, New York, NY 10019.

34. Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. China Renaissance's address is Units 8107-08, Level 81, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong Special Administrative Region of the PRC.

35.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CICC's address is 29/F, One International Finance Centre, 1 Harbour View Street, Central, Hong Kong Special Administrative Region of the PRC.

36.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 388 Greenwich Street, New York, NY 10013.

37.     Defendant Guotai Junan Securities (Hong Kong) Limited ("Guotai Junan") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Guotai Junan's address is 27/F., Low Block, Grand Millennium Plaza, 181 Queen's Road Central, Hong Kong Special Administrative Region of the PRC.

38.     Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. HSBC's address is 452 Fifth Avenue, New York City, NY 10018.

39.     Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. UBS' address is 1285 Avenue of The Americas, New York, NY 10019.

40.     Defendant BOCI Asia Limited ("BOCI") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BOCI's address is 26th Floor, Bank of China Tower 1 Garden Road, Central, Hong Kong Special Administrative Region of the PRC.

41.    Defendant BOCOM International Securities Limited ("BOCOM") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BOCOM's address is 9th Floor, Man Yee Building, 68 Des Voeux Road, Central, Hong Kong Special Administrative Region of the PRC.

42.    Defendant CCB International Capital Limited ("CCB") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CCB's address is 12/F, CCB Tower, 3 Connaught Road Central, Central, Hong Kong Special Administrative Region of the PRC.

43.    Defendant CLSA Limited ("CLSA") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CLSA's address is 18/F, One Pacific Place, 88 Queensway, Hong Kong Special Administrative Region of the PRC.

44.    Defendant CMB International Capital Limited ("CMB") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CMB's address is 45F, Champion Tower, 3 Garden Road, Central, Hong Kong Special Administrative Region of the PRC.

45.    Defendant Futu Inc. ("Futu") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Futu's address is 720 University Avenue, Suite 100, Palo Alto, CA 94301.

46.    Defendant ICBC International Securities Limited ("ICBC") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. ICBC's address is 37/F, ICBC Tower, 3 Garden Road, Hong Kong Special Administrative Region of the PRC.

47.     Defendant Mizuho Securities USA LLC ("Mizuho") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Mizuho's address is 1271 Avenue of the Americas, Floors 2, 3, 4, 18, and 19, New York, NY 10020.

48.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Tiger Brokers' address is Level 16, 191 Queen Street, Auckland Central, New Zealand, 1010.

49.     Defendants named in ¶¶ 29-48 are referred to herein as the "Underwriter Defendants."

50.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities. They served as the underwriters of the IPO and received substantial fees from the IPO collectively for their service. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from the Company, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from the Company and the Individual Defendants that DiDi would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of DiDi, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the

IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management, and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement and in turn, what information would be omitted from disclosure; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives including, but not limited to the Executive Defendants, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

51.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

52.    Defendant Colleen A. De Vries ("De Vries") was at the time of the IPO DiDi's duly authorized representative in the United States. Defendant De Vries signed the false and misleading Registration Statement on her own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant De Vries' employer.

53.     Defendant Cogency Global was DiDi's authorized U.S. representative for purposes of the IPO. Defendant De Vries, who signed the Registration Statement, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act

54.     The Company, the Individual Defendants, the Underwriter Defendants, Defendant De Vries, and Defendant Cogency Global are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### DiDi's False and/or Misleading Registration Statement

55.     On June 10, 2021, DiDi (then-named Xiaoju Kuaizhi Inc.) filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.

56.     On June 30, 2021, DiDi filed with the SEC the final prospectus for the IPO on Form 424B4, which forms part of the Registration Statement. In the IPO, DiDi sold 316,800,000 ADSs at $14.00 per share.

57.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other material facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

58.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

59.     The Registration Statement emphasized that DiDi relied on the market in China for its operations, stating that "China is the best starting place for realizing [DiDi's] vision for mobility" and "China's mobility market is expected to reach US$3.9 trillion by 2040, by which time the penetration of shared mobility and electric vehicles is expected to have increased to 35.9% and 50.2%, respectively…"

60.     DiDi also stated that "[i]n 2020, the number of ride hailing transactions from our top five cities in China constituted approximately 20% of our total China ride hailing transactions." Therefore, "any changes to local laws or regulations within these cities that affect [the Company's] ability to operate or increase [its] operating expenses in these markets would have an adverse effect on our business."

61.     However, throughout the Registration Statement, DiDi failed to disclose its ongoing discussions with Chinese authorities related to DiDi's non-compliance with certain laws and regulations, including with regard to technology-related and cybersecurity connected to collecting and storing data such as personal information.

62.     Rather than disclose these regulatory discussions into the Company's practices and non-compliance with relevant technology laws, the Registration Statement vaguely discussed China's regulatory regime with regards to data security. Thus, the risk disclosures themselves were materially misleading because they failed to disclose the ongoing discussions with Chinese authorities or the Company's non-compliance with the relevant regulations. Specifically, the Registration Statement represented that:

**Regulation Relating to Internet Security**

The PRC government has enacted various laws and regulations with respect to internet security and protection of personal information from any inappropriate collection activities, abuse or unauthorized

disclosure. Internet information in the PRC is regulated and restricted from a national security standpoint. …

According to the Cybersecurity Law and other related laws and regulations, internet service providers are required to take measures to ensure internet security by complying with security protection obligations, formulating cybersecurity emergency response plans, and providing technical assistance and support for public security and national security authorities. In addition, any collection, process and use of a user's personal information must be subject to the consent of the user, be legal, rational and necessary, and be limited to specified purposes, methods and scopes. An internet service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or providing such information to other parties illegally.

***Failure to comply with the above laws and regulations may subject the internet service providers to administrative penalties including, without limitation, fines, suspension of business operation, shutdown of the websites, revocation of licenses and even criminal liabilities.***

On June 10, 2021, the Standing Committee of the National People's Congress of China promulgated the Data Security Law, which will take effect in September 2021. ***The Data Security Law provides for data security and privacy obligations on entities and individuals carrying out data activities.*** The Data Security Law also introduces a data classification and hierarchical protection system based on the

importance of data in economic and social development, as well as the degree of harm it will cause to national security, public interests, or legitimate rights and interests of individuals or organizations when such data is tampered with, destroyed, leaked, or illegally acquired or used. The appropriate level of protection measures is required to be taken for each respective category of data. For example, a processor of important data shall designate the personnel and the management body responsible for data security, carry out risk assessments for its data processing activities and file the risk assessment reports with the competent authorities. In addition, the Data Security Law provides a national security review procedure for those data activities which may affect national security and imposes export restrictions on certain data and information. As the Data Security Law was recently promulgated and has not yet taken effect, we may be required to make further adjustments to our business practices to comply with this law.

**Regulations Relating to Privacy Protection**

In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Cyber Security Law imposes certain data protection obligations on network operators, including that ***network operators may not disclose, tamper with, or damage users' personal information that they have collected, or provide users' personal information to others without consent***. Exempted from these rules is information irreversibly processed to preclude identification of specific individuals. ***Moreover, network operators are obligated to delete unlawfully collected information and to amend incorrect information.***

- 14 -

The Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT on December 29, 2011 and effective on March 15, 2012, stipulate that internet information service providers may not collect any user personal information or provide any such information to third parties without the consent of a user, unless otherwise stipulated by laws and administrative regulations. "User Personal information" is defined as information relevant to the users that can lead to the recognition of the identity of the users independently or in combination with other information. An internet information service provider must expressly inform the users of the method, content and purpose of the collection and processing of such user personal information and may only collect such information as necessary for the provision of its services. ***An internet information service provider is also required to properly store user personal information***, and in case of any leak or likely leak of the user personal information, the internet information service provider must take immediate remedial measures and, in severe circumstances, make an immediate report to the telecommunications regulatory authority.

The Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress on December 28, 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by the MIIT on July 16, 2013, stipulate that any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scope. ***An internet information***

*service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or proving such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. Any violation of the above decision or order may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.*

With respect to the security of information collected and used by mobile apps, pursuant to the Announcement of Conducting Special Supervision against the Illegal Collection and Use of Personal Information by Apps, which was issued by the Cyberspace Administration of China [the "CAC"], the MIIT, the Ministry of Public Security, and the State Administration for Market Regulation on January 23, 2019, *app operators shall collect and use personal information in compliance with the Cyber Security Law and shall be responsible for the security of personal information obtained from users and take effective measures to strengthen personal information protection*. Furthermore, app operators shall not force their users to make authorization by means of default settings, bundling, suspending installation or use of the app or other similar means and shall not collect personal information in violation of laws, regulations or breach of user agreements. Such regulatory requirements were emphasized by the Notice on the Special Rectification of Apps Infringing upon User's Personal Rights and Interests, which was issued by MIIT on October

31, 2019. On November 28, 2019, the Cyberspace Administration of China, the MIIT, the Ministry of Public Security and the State Administration for Market Regulation jointly issued the Methods of Identifying Illegal Acts of Apps to Collect and Use Personal Information. This regulation further illustrates certain commonly seen illegal practices of app operators in terms of personal information protection and specifies acts of app operators that will be considered as "collection and use of personal information without users' consen.t" [sic]

On May 28, 2020, the National People's Congress adopted the Civil Code, which came into effect on January 1, 2021. Pursuant to the Civil Code, the personal information of a natural person shall be protected by the law. Any organization or individual shall legally obtain such personal information of others when necessary and ensure the safety of such information, and shall not illegally collect, use, process or transmit personal information of others, or illegally purchase or sell, provide or disclose personal information of others.

(Emphasis added.)

63.    The generic disclosures about China's internet security regulations in the Registration Statement are in contrast to the Company's specific disclosures regarding the risks of relevant Chinese authorities' anti-trust and anti-monopoly investigations. The Registration Statement stated, in pertinent part, the following regarding its relevant regulations, discussions, investigations, and proceedings:

/ / /

/ / /

/ / /

**LEGAL PROCEEDINGS**

We are regularly subject to various types of legal proceedings by drivers, consumers, employees, commercial partners, competitors, and government agencies, among others, as well as investigations and other administrative or regulatory proceedings by government agencies. In the ordinary course of our business, various parties claim that we are liable for damages related to accidents or other incidents involving drivers, consumers or other third parties on our platform. We are also subject to contractual disputes with drivers and other third parties. We are currently named as a defendant in a number of matters related to accidents or other incidents involving drivers, consumers and other third parties, and in matters related to contract disputes. Furthermore, we are involved in disputes with third parties asserting, among other things, alleged infringement of their intellectual property rights.

***There is no pending or threatened legal proceeding that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations.*** However, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents could, in the aggregate, have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

64.     Rather than disclose the known regulatory discussions into the Company's practices and non-compliance with relevant laws, the Registration Statement provided boilerplate risk statements about potential contingent future

- 18 -

issues that may occur, rather than issues that had materialized. While these risk statements acknowledged the material importance to investors of China's regulatory regime and potential investigations in into the Company, these statements neglected to warn investors of the risks that had materialized for the the Company – the ongoing technology-based issues, investigations, and discussions. The Registration Statement stated, in pertinent part, the following regarding its relevant risks, among other things, connected to data security and cybersecurity:

> Our business is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security. Any losses, unauthorized access or releases of confidential information or personal data could subject us to significant reputational, financial, legal and operational consequences.

> We receive, transmit and store a large volume of personally identifiable information and other data on our platform. We are subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions. See "Regulation" for laws, rules and regulations applicable to us, including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021. Interpretation, application and enforcement of these laws, rules and regulations evolve from time to time and their scope may continually change, through new legislation, amendments to existing legislation and changes in enforcement. We have incurred, and will continue to incur, significant expenses in an effort to comply with privacy, data protection and information security standards and

protocols imposed by law, regulation, industry standards or contractual obligations. Changes in existing laws or regulations or adoption of new laws and regulations relating to privacy, data protection and information security, particularly any new or modified laws or regulations that require enhanced protection of certain types of data or new obligations with regard to data retention, transfer or disclosure, could greatly increase the cost to us of providing our service offerings, require significant changes to our operations or even prevent us from providing certain service offerings in jurisdictions in which we currently operate or in which we may operate in the future.

Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, *it is possible that our practices, offerings or platform could fail to meet all of the requirements imposed on us by such laws*, regulations or obligations. Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security that results in unauthorized access, use or release of personally identifiable information or other data, or the perception or allegation that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing drivers and riders from using our platform or result in investigations, fines, suspension of one or more of our apps, or other penalties by government authorities and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations. Even if our practices are not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our

reputation and brand and adversely affect our business, financial condition and results of operations.

**_Maintaining and enhancing our brand and reputation is critical to our business prospects._** We were subject to negative publicity in the past, and failure to maintain our brand and reputation will cause our business to suffer.

**_Maintaining and enhancing our brand and reputation is critical_** to our ability to attract new consumers, drivers and partners to our platform, to preserve and deepen the engagement of our existing consumers, drivers and partners and **_to mitigate legislative or regulatory scrutiny, litigation, government investigations and adverse public sentiment_**. Negative publicity, whether or not justified, can spread rapidly through social media. To the extent that we are unable to respond timely and appropriately to negative publicity, our reputation and brand can be harmed. ...

(Emphasis added.)

65.     The statements contained in ¶¶ 59-64 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (1) the CAC urged Defendant DiDi to delay its IPO; (2) Defendant DiDi "had the problem of collecting personal information in violation of relevant PRC laws and regulations"; (3) Defendant DiDi could not guarantee acceptable levels of data security; (4) due to the foregoing, Defendant DiDi would face "serious, perhaps

unprecedented, penalties" from relevant authorities; (5) DiDi and its many apps would face an imminent cybersecurity review by the CAC, which could lead to removal of Didi's apps from app stores; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

66.    The statements contained in ¶¶ 59-64 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the CAC urged Defendant DiDi to delay its IPO; (2) Defendant DiDi "had the problem of collecting personal information in violation of relevant PRC laws and regulations"; (3) Defendant DiDi could not guarantee an acceptable level of data security; (4) due to the foregoing, Defendant DiDi would face "serious, perhaps unprecedented, penalties" from relevant authorities; (5) DiDi and its many apps would face an imminent cybersecurity review by the CAC, which could lead to removal of Didi's apps from app stores; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

67.    Then on July 2, 2021, just two days after the IPO, the Company issued a press release entitled "DiDi Announces Cybersecurity Review in China" which announced, in relevant part, that: "pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority. During the review, DiDi is required to suspend new user registration in China."

68.    On this news, the Company's ADS price fell 5% to close at $15.53 per ADS on July 2, 2021, damaging investors.

69.     On July 4, 2021, the Company issued a press release entitled "DiDi Announces App Takedown in China" which announced, in relevant part, that:

*according to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 4, 2021, the CAC stated that it was reported and confirmed that the "DiDi Chuxing" app had the problem of collecting personal information in violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down the "DiDi Chuxing" app in China*, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information.

Once the "DiDi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. ***The Company expects that the app takedown may have an adverse impact on its revenue in China.***

(Emphasis added.)

70.     The statements contained in ¶¶ 67 and 69 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were

known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the CAC urged Defendant DiDi to delay its IPO; (2) Defendant DiDi "had the problem of collecting personal information in violation of relevant PRC laws and regulations"; (3) Defendant DiDi could not guarantee an acceptable level of data security; (4) due to the foregoing, Defendant DiDi would face "serious, perhaps unprecedented, penalties" from relevant authorities; (5) DiDi and its many apps would face an imminent cybersecurity review by the CAC, which could lead to removal of Didi's apps from app stores; and (6) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

71.     On July 5, 2021, just five days after the IPO, the *Wall Street Journal* published an article entitled "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog" which reported the following, in pertinent part:

> ***Weeks before Didi Global Inc. [] went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security***, according to people with knowledge of the matter.
>
> But for Didi, waiting would be problematic. In the absence of an outright order to halt the IPO, it went ahead.

- 24 -

The company, facing investor pressure to list after raising billions of dollars from prominent venture capitalists, wrapped up its pre-offering "roadshow" in a matter of days in June—much shorter than typical investor pitches made by Chinese firms. The listing on the New York Stock Exchange raised about $4.4 billion, making it the biggest stock sale for a Chinese company since Alibaba Group Holding Ltd. BABA[]'s IPO in 2014.

Back in Beijing, officials, especially those at the Cyberspace Administration of China, remained wary of the ride-hailing company's troves of data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said.

Didi's American depositary shares began trading in New York on Wednesday, just a day before the ruling Communist Party celebrated its centenary.

The Cyberspace Administration waited a day after the major political event to deliver a one-two punch to the company. On Friday, it started its own cybersecurity review into Didi and blocked the company's app from accepting new users; and on Sunday, it ordered mobile app stores to pull Didi from circulation.

(Emphasis added.)

72.    On this news, the Company's ADS price fell 4% to close at $11.91 per ADS on July 7, 2021.

73.    On July 9, 2021, the *Wall Street Journal* published an article entitled "China Orders Stores to Remove More Apps Operated by Didi: Cyber watchdog

- 25 -

says the apps illegally collect personal data" which reported the following, in pertinent part:

> **China ordered mobile app stores to remove 25 more apps operated by Didi Global Inc.'s [] China arm, saying the apps illegally collect personal data**, escalating its regulatory actions against the ride-hailing company.
>
> The apps newly targeted on Friday include Didi's app for drivers offering rides through its platform, an app for corporate users and a financing app. …
>
> **The cyber watchdog also banned websites and platforms from providing access to Didi-linked services in China**, according to the watchdog's statement.
>
> \*       \*       \*
>
> **Didi said it will follow the authorities' orders. In a statement it posted on social media platform Weibo, the company also said it guarantees personal data security.** …
>
> Users of Didi's main app in China are able to hail rides, rent bikes and even buy groceries. Other apps operated by Didi are linked to, or supplement, services offered on the main app. The apps that regulators targeted Friday include those for drivers providing rides through Didi and types for specific users such as corporate customers or the elderly.

> ***The latest regulatory actions could further dent Didi's business in its home market, which the company relies heavily on for revenue*** even as it expands into overseas markets. …
>
> ***Some rivals have already started marketing more aggressively in recent days in an effort to steal market share. Didi's Chinese market share is around 80% to 90%***, according to Cherry Leung, an analyst at Sanford C. Bernstein in Hong Kong.

(Emphasis added.)

74.     On July 12, 2021, before the market opened, the Company issued a press release entitled "Didi Announces Takedown of Additional Apps in China" which announced the following, in pertinent part:

> According to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 9, 2021, ***the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China***, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and ***rectify the problem to ensure the security of users' personal information. The Company expects that the app takedown may have an adverse impact on its revenue in China.***

(Emphasis added.)

75.     On this news, the Company's ADS price fell 7%, to close at $12.49 per ADS on July 12, 2021, further damaging investors.

76.     On July 16, 2021, the *Wall Street Journal* published an article entitled "China Sends State Security, Police Officials to Didi for Cybersecurity Probe" which reported the following, in pertinent part:

> China sent regulators including state security and police officials to Didi Global Inc.'s [] ride-hailing business on Friday as part of a cybersecurity investigation, the latest development in a regulatory saga that has gripped China's tech industry.
>
> Regulators from government units including the Ministry of Public Security, the Ministry of State Security, the Cyberspace Administration of China, the Ministry of Transport and Ministry of Natural Resources will be stationed at Didi starting Friday for the investigation, the cyberspace administration said in an online statement.
>
> The Cyberspace Administration of China, the country's internet regulator, earlier this month ordered Didi to undergo a cybersecurity review over national-security concerns, days after the company raised $4.4 billion in a New York initial public offering. The regulator also said Didi illegally collected personal data and ordered more than two dozen of its apps removed from app stores.
>
> The Ministry of Public Security is in charge of China's domestic security, while the Ministry of State Security oversees the country's civilian arm for intelligence gathering and counterespionage. …

*Still, their participation signals the potentially serious nature of the investigation. Potential outcomes include financial penalties, suspensions of business licenses and criminal charges.*

*The large number of ministries participating in the probe also highlights the breadth of the data Didi holds and that is now coming under regulatory scrutiny.* The Transport Ministry regulates the ride-hailing industry, while the Ministry of Natural Resources is in charge of mapping and road surveying.

(Emphasis added.)

77.   On the same day, *Forbes* published an article entitled: "Didi Faces Cybersecurity Investigation By Seven Government Departments."  In the article, Shen Meng, director of Beijing-based investment bank Chanson and Co., is states that DiDi's rush to complete its IPO before getting regulatory approval "is clearly not allowed."

78.   On July 18, 2021, the *Wall Street Journal* published an article entitled "In the New China, Didi's Data Becomes a Problem" which reported the following, in pertinent part, regarding the amount and types of data the Company holds and compiles:

*Bolstered by its wide swath of data on users, mapping and traffic, Didi Global Inc. became the dominant ride-hailing company in China. Now, that data is turning into a liability.* …

[Chinese state-security, police officials, and other regulators'] target is a company with 377 million annual active users and 13 million annual active drivers in China. *Users turn over their cellphone numbers,*

- 29 -

*which in China are linked to their real names and identifications. They also often voluntarily share photos, frequent destinations such as home and office, their gender, age, occupation and companies. To use other Didi services such as carpooling or bike sharing, customers might also have to share other personal information including facial-recognition data.*

*Drivers must give Didi their real names, vehicle information, criminal records, and credit- and bank-card information.*

The company in securities filings touts its repository of real-world traffic data as the world's largest. *The 25 million daily rides on its platform in China feed a database of pickup points, destinations, routes, distance and duration. In-car cameras and voice recorders capture conversations.*

*Adding to the sensitivity, the company in 2017 won a government license to produce high-precision maps, a sector shut to foreign companies for national-security reasons.* It is a rare privilege—only 29 Chinese entities are licensed to do detailed surveying and mapping, according to data compiled by researcher IDC and government statements. That, combined with Didi's real-time location data, could raise national-security concerns, analysts and lawyers said.

"Mapping points to potentially sensitive areas such as Chinese defense zones, and this can be a treasure trove of information for hostile actors," said Carly Ramsey, a Shanghai-based director at consulting firm Control Risks Group. …

- 30 -

The company has said it stores all its domestic user data in China. In addition to ride hailing and bike sharing, the company operates financial services, a group-buying grocery business, and a van-hailing service for moving or carrying large items.

*A 2015 collaboration between Didi and a unit of China's state-run Xinhua News Agency provided startling visibility into what this data could reveal about the government.* The project analyzed rides to or from various government departments, including 1,327 trips in 24 hours to or from the Ministry of Public Security, China's police. The article gave a detailed hourly breakdown of the arrivals and departures, then cross-referenced them to investigations in the news to speculate about what cases might have been keeping officers busy.

*Xinhua and Didi also compared rides to and from about 20 other ministries and government departments.* The data showed 298 rides left the now-dissolved Ministry of Land and Resources between the hours of 6 p.m. and 2 a.m. in the two days the study was conducted, leading the authors to conclude the ministry had the "most ruthless" overtime hours.

\*   \*   \*

*In 2017, state-run CCTV ran an exposé showing how a consumer's Didi user records, including pickup and drop-off locations and timings, could be purchased on the black market for the equivalent of around $8.50 for a page of data.*

- 31 -

1

2                                    *      *      *

3

4          In March, a Didi executive speaking at a "smart transportation"

5      conference in Nanjing, in eastern China, said the company could be a

6      valuable partner to the Transport Ministry, according to material posted

7      on the event organizer's website. Didi cars travel Beijing streets

8      hundreds of times every day, if not more, and the data gathered gives

9      an accurate picture of the city's traffic conditions, said Ding Neng, a

10     vice president at the company. ***The in-car cameras Didi has installed***

11     ***in more than 300 Chinese cities also constantly record video from***

12     ***inside and outside the vehicle, Mr. Ding told attendees.***

13

14         ***In Shenzhen, Didi built a big data transportation management***

15     ***platform with the local transportation regulator. The company also***

16     ***helped install hundreds of smart traffic signals in Wuhan, Jinan and***

17     ***other cities to ease congestion by crunching data from its ride-hailing***

18     ***operations, including routes and speeds.***

19

20         However, the company has resisted sharing certain data with regulators.

21     In 2018, after two incidents of female passengers killed by Didi drivers,

22     ***a Guangdong province transportation official said the company***

23     ***hadn't fully complied with regulations*** that required it to send real-

24     time data on vehicle routes and driver information to a supervising

25     platform run by authorities.

26

27     (Emphasis added.)

28         79.    On this news, the Company's ADS price fell 7%, to close at $11.06 per

ADS on July 19, 2021, further damaging investors.

80.    On July 20, 2021, pre-mark, *Reuters* published an article entitled "EXCLUSIVE How Didi's govt [SIC] relations team navigated myriad regulators, until IPO dustup" which reported that "only 20%-30% of Didi's business [SIC] in China are fully compliant with regulations requiring three permits: one for the company to provide online ride-hailing services, a transportation permit for the vehicle and a license for the driver."  Further, Reuters reported that "[i]n the run up to the IPO, the [government relations] team came under pressure from senior management to fend off regulatory scrutiny and it, in turn, relied heavily on 'guanxi', or personal relationships[.]"

81.    On July 22, 2021, pre-market, *Bloomberg* published an article entitled "China Weighs Unprecedented Penalty for Didi After U.S. IPO" which reported the following, in pertinent part:

> ***Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi Global Inc. after its controversial initial public offering last month***, according to people familiar with the matter.

> Regulators see the ride-hailing giant's decision to go public despite pushback from the Cyberspace Administration of China as a challenge to Beijing's authority, the people said, asking not to be named because the matter is private. …

> ***Regulators are weighing a range of potential punishments, including a fine, suspension of certain operations or the introduction of a state-owned investor, the people said. Also possible is a forced delisting or withdrawal of Didi's U.S. shares, although it's unclear how such an option would play out.*** …

- 33 -

1

2    ***Beijing is likely to impose harsher sanctions on Didi than on Alibaba***

3    ***Group Holding Ltd., which swallowed a record $2.8 billion fine*** after

4    a monthslong antitrust investigation and agreed to initiate measures to

5    protect merchants and customers, the people said.

6

7                          *        *        *

8

9    China's regulators largely supported the idea of an IPO, but ***they***

10   ***expressed concerns about Didi's data security practices since at least***

11   ***April***, the people said. ***In one example of concern, Didi had disclosed***

12   ***statistics on taxi trips taken by government officials***, one of the people

13   said, although it's not clear whether that specific issue was raised with

14   the company.

15

16   ***Regulators urged Didi to ensure the security of its data before***

17   ***proceeding with the IPO or to shift the location to Hong Kong or***

18   ***mainland China*** where disclosure risks would be lower, the people

19   said. Regulators didn't explicitly forbid the company from going public

20   in the U.S., but ***they felt certain Didi understood the official***

21   ***instructions***, they said.

22

23   One person involved in the meetings, when asked why Didi didn't act

24   on suggestions from regulators, referred to a proverb that you can't

25   wake a person pretending to sleep.

26

27                          *        *        *

28

- 34 -

Some regulatory officials expressed in private that they think Didi may have rushed its IPO out before China unveiled a new web security law, which could have hurt its valuation, one of the people said. Just days after the offering, China proposed new rules that would require nearly all companies seeking to list in foreign countries to undergo a CAC cybersecurity review.

\*       \*       \*

By March, they had homed in on the U.S. because the listing rules were more amenable and the company expected a better valuation from investors familiar with its American counterpart, Uber Technologies Inc. *The Hong Kong exchange also questioned Didi's compliance with Chinese regulations. It didn't have licenses to operate in certain cities and many of its drivers lacked a household registration, or hukou, for the cities where they lived, part of municipal requirements for providing on-demand ride-hailing services there.*

\*       \*       \*

*Cheng, President Jean Liu, investors and their bankers faced the choice of erring on the side of caution or proceeding with an offering that would fill the company's coffers and enrich all of them. On June 28, they gave the green light.*

(Emphasis added.)

82.    On this news, the Company's ADS price fell $3.44 per ADS, nearly 30%, over the next two trading days to close at $8.06 per ADS on July 23, 2021,

further damaging investors.

83.    Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, DiDi's ADS price has fallen significantly below its IPO price, damaging Plaintiff and Class members.

84.    Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties that were or were reasonably likely to adversely affect the Company. Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

85.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

87.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Plaintiff's claims are typical of the claims of the members of the Class as they were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

90.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws;

(b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(c)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, outlook and/or management of the Company;

(d)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(f)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h)     to what extent the members of the Class have sustained damages and the proper measure of damages.

91.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### For Violations of Section 11 of the Securities Act
### Against All Defendants

92.     Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

93.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

94.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

95.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

96.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

- 38 -

97.    By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated Section 11 of the Securities Act.

98.    Plaintiff and other Class members acquired the Company's securities pursuant to the Registration Statement.

99.    At the time of their purchases of DiDi securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this Complaint is based, to the time that Plaintiff commenced this action.  Less than three years have elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

100.   Plaintiff and the Class have sustained damages.  The value of DiDi securities has declined substantially due to Defendants' violations.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

101.   Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

102.   By means of the defective Registration Statement, Defendants promoted, solicited, and sold DiDi securities to Plaintiff and other members of the Class.

103.   The Registration Statement for the IPO contained false and misleading statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the

Registration Statement to ensure that such statements were true and that there was no omission to state a material fact necessary to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

104.   Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Registration Statement at the time Plaintiff acquired DiDi securities.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

105.   By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased DiDi securities pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

## COUNT III
### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

106.   Plaintiff repeats and re-alleges each and every allegation contained above, as if fully set forth herein.

107.   This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against all Defendants except the Underwriter Defendants.

108.   The Individual Defendants were controlling persons of DiDi within the meaning of the Securities Act by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company. The Company controlled the Individual Defendants and all of DiDi employees.

109.   The Company and the Individual Defendants were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

110.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT IV
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Defendants DiDi and the Executive Defendants

111.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.   This Count is asserted against the Company and the Executive Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113.   During the Class Period, Defendants DiDi and the Executive Defendants, individually and in concert, carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase DiDi securities at artificially inflated

- 41 -

prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

114. During the Class Period, Defendants DiDi and the Executive Defendants, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115. Defendants DiDi and the Executive Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

116. Defendants DiDi and the Executive Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary

information concerning the Company, participated in the fraudulent scheme alleged herein.

117.   The Executive Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

118.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Executive Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Executive Defendants' false and misleading statements.

119.   Had Plaintiff and the other members of the Class been aware that the market price of DiDi securities had been artificially and falsely inflated by the Company's and the Executive Defendants' misleading statements and by the material adverse information which the Company and the Executive Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

120.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

121.   By reason of the foregoing, the Company and the Executive Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the

Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

122.   This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT V**
**Violation of Section 20(a) of The Exchange Act**
**Against the Executive Defendants**

123.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

124.   The Executive Defendants acted as controlling persons of DiDi within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as alleged herein. During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.  The Executive Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

125.   As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

126.   Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various

reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Executive Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

127.   The Executive Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or directors of the Company, they had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Executive Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

128.   By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)   declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)   awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

1       (c)    awarding Plaintiff and the Class reasonable costs and expenses incurred

2  in this action, including counsel fees and expert fees; and

3       (d)    awarding Plaintiff and other members of the Class such other and

4  further relief as the Court may deem just and proper.

5                     **JURY TRIAL DEMANDED**

6      Plaintiff hereby demands a trial by jury.

7  DATED: September 2, 2021        **WOLF HALDENSTEIN ADLER**

8                       **FREEMAN & HERZ LLP**

9              By:     */s/ Rachele R. Byrd*

10                       RACHELE R. BYRD

11                      BETSY C. MANIFOLD

12                      manifold@whafh.com

13                      RACHELE R. BYRD

14                      byrd@whafh.com

15                      MARISA C. LIVESAY

16                      livesay@whafh.com

17                      BRITTANY N. DEJONG

18                      dejong@whafh.com

19                      750 B Street, Suite 1820

20                      San Diego, CA 92101

                        Los Angeles, CA 90071

21                      Telephone: (619) 239-4599

22                      **WOLF HALDENSTEIN ADLER**

23                       **FREEMAN & HERZ LLP**

24                      MATTHEW M. GUINEY

25                      guiney@whafh.com

26                      PATRICK DONOVAN

                        donovan@whafh.com

27                      270 Madison Avenue

                        New York, NY 10016

28                      Tel: (212) 545-4600

                        ***Counsel for Plaintiff***

27626